## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Ellen Pataro,                                    NO. _____

                Plaintiff,              JURY TRIAL DEMANDED.

v.

Héctor D. Castellón, Héctor O. Castellón and
Jacqueline Castellón,

                Defendants.

_____/

### COMPLAINT FOR CIVIL RICO, FRAUD AND CONSPIRACY

Plaintiff Ellen Pataro (the "Plaintiff"), by and through her undersigned counsel, alleges as follows:

### Nature of the Action

1.     This action arises from frauds perpetrated by the defendants through a conspiracy involving money laundering, unlicensed money transmitting businesses and wire fraud.  The defendants have since at least 2008 been laundering the proceeds from smuggling billions of dollars in Venezuelan gold, using numerous onshore and offshore companies under their control, and investing the proceeds in the United States and elsewhere, to acquire or control real estate development projects or other enterprises.

2.     Plaintiff holds a ~$50 million civil money judgment against her ex-husband, Mario Pataro, who is a long-time associate of the defendants and since October 2017, has been a fugitive from a Florida writ of bodily attachment.

1

3. When Mario Pataro fled the jurisdiction, the defendants conspired to use their money laundering, money transmitting and wire fraud operations to defraud the Plaintiff. To evade the consequences of his contempt of court, including the threat of incarceration for 179 days, Mario Pataro fled the jurisdiction and then conspired with the other defendants, and other non-parties, and through a pattern of racketeering activity, to defraud the Plaintiff and disguise ownership of valuable assets.

4. The defendants used the money laundering, money transmitting and wire fraud enterprises, and their control of non-party Fernandez and Associates Investments, LLC and other enterprises, to misrepresent and conceal Mario Pataro's interests in valuable assets, including equity in certain companies, cash accounts and other property, and, upon information and belief, at least two luxury condominiums in Miami, all for the purpose of preventing Plaintiff from lawfully executing on those assets and others in satisfaction of the judgment. The scheme has succeeded in depriving Plaintiff of at least $2 million in recovery on the judgment, and undoubtedly many millions more, by preventing Plaintiff from discovering other additional untold assets secretly owned by Mario Pataro. Plaintiff seeks threefold damages, costs and attorneys' fees to be determined at trial.

## Jurisdiction and Venue

5. This Court has original jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964.

6. This Court has supplemental jurisdiction over the Florida state law claims under 28 U.S.C. § 1367 because those claims form part of the same federal case or controversy.

7. Venue is proper under 18 U.S.C. § 1965 because the defendants reside, are found, have agents and/or transact their affairs in this District. Venue is proper under 28 U.S.C. § 1391

because the defendants reside in this District and because a substantial part of the events giving rise to the claims occurred in this District.

## Parties

8.      Plaintiff Ellen Pataro is a natural person resident of Miami, Florida.

9.      Defendant Hector D. Castellon ("Hector Junior") is a natural person residing in Miami, Florida.

10.     Defendant Hector O. Castellon ("Hector Senior") is a natural person residing in Miami, Florida, and Hector Junior's father.

11.     Defendant Jacqueline Castellon is a natural person residing in Miami, Florida, and Hector Senior's sister.

## Non-Parties

### Select Non-Party Defendant Affiliates

12.     3898 Shipping Ave LLC ("Merrick Towers") is a Florida limited liability company and the owner and developer with plans to construct two 20-story buildings and a parking garage at 3898 Shipping Avenue in Miami, known as the Merrick Towers.   The manager of record of Merrick Towers is the defendant Hector Senior's wife, Maira Castellon; however, upon information and belief, Merrick Towers is in fact owned and/or controlled by Hector Senior.

13.     A&C Trading N.V. ("A&C Trading") was a Curaçao company controlled by non-party and former boyfriend of Jacqueline Castellon, Javier German Otero Centeno ("Javier Otero") and Javier Otero's sister, Francis Josephina Lopez Centeno.

14.     Acroyali Qingdao Ltd. ("Acroyali") is a Hong Kong company associated with Eric Jose Ghelman Delia ("Eric Ghelman") and, upon information and belief, controlled by Hector Senior.

15.     Auryquim International, Inc. ("Auryquim") is a Florida corporation controlled by Jacqueline Castellon and Javier Otero.

16.     Caran Consultant, Inc. ("Caran Consultant") is a Florida corporation controlled by Jacqueline Castellon.

17.     Caran Precious Metals N.V. ("Caran Precious Metals") is a Curaçao company controlled by Jacqueline Castellon and, upon information and belief, Hector Senior.

18.     CDG Solutions Inc. NV is a Curaçao company and CDG Solutions Panama SA is a Panama company; each controlled, upon information and belief, by Hector Senior, Gustavo Adolfo Dam Ochoa and Eric Ghelman.

19.     Corofin Corp. ("Corofin") is a Florida corporation ostensibly owned by Hector Senior's sister-in-law Yajaira C. Rodriguez, but in fact controlled by Hector Senior and Hector Junior.

20.     CP Golden Bridge BV ("CP Golden Bridge") is a Curaçao company ostensibly owned by Jacqueline Castellon's mother's friend, Oneida Turmero, but, upon information and belief, is in fact controlled by Jacqueline Castellon and Hector Senior.

21.     Fernandez and Associates Investments, LLC ("Fernandez & Associates") is a Florida limited liability company, upon information and belief, controlled by the defendants.

22.     Flagler & 54, LLC ("Flagami Storage") is a Florida limited liability company and developer with plans to construct a 7-story, 179,175-square-foot storage facility at 5402 West Flagler Street in Miami, known as Flagami Storage.  The manager of record of Flagami Storage is Hector Senior.

23.     Globalfin Corp. ("Globalfin) is a Florida corporation ostensibly owned by the defendants' cousin, Leonardo A. Anez Gonzalez, but in fact controlled by Hector Senior and Hector Junior.

24.     Gold Trading Center LLC ("Gold Trading Center") was a Florida limited liability company controlled by Hector Senior, which, upon information and belief, may have been transferred to the ostensible ownership of Oneida Turmero, Oneida PM Traders DMCC and/or Anibal Alberto Monteiro Ramos.

25.     Ingeser BV ("Ingeser") is a Curaçao company ostensibly owned by Marzuli Deveza Gonzalez, a friend of Jacqueline Castellon, but, upon information and belief, is in fact controlled by Jacqueline Castellon, Hector Senior and Hector Junior.

26.     Interactive Ameritrade BV ("Interactive Ameritrade") is a Curaçao company ostensibly owned first by Milagros Del Valle Gonzalez, sister-in law of Hector Senior, and now by Anibal Alberto Monteiro Ramos, but, upon information and belief, is in fact controlled by Jacqueline Castellon, Hector Senior and Hector Junior.

27.     Jasel International Solutions ("Jasel") was a Belize company and then a Curaçao company controlled by Jacqueline Castellon and, upon information and belief, Hector Senior.

28.     JJ Brothers International Solutions B.V. ("JJ Brothers") is a Curaçao company, upon information and belief, controlled by Javier Otero and his sister, Jeimy Lopez.

29.     Oneida PM Traders DMCC ("Oneida") is a Dubai company ostensibly owned by Jacqueline Castellon's mother's friend, Oneida Turmero, but, upon information and belief, is in fact controlled by Hector Senior, Hector Junior and Jacqueline Castellon.

30.     Javier Otero is a natural person residing, upon information and belief, in the Bolivarian Republic of Venezuela ("Venezuela"), who conducts business through Jacqueline

Castellon, and through the Florida corporations, non-parties Auryquim International, Inc. and Caran Consultant, Inc.

31.     Panaton GSI DMCC ("Panaton") is a Dubai company, upon information and belief, controlled by Javier Otero and his sister, Jeimy Lopez.

32.     Precofin Advisors Corp. ("Precofin Florida") was a Florida corporation ostensibly owned by Hector Senior's sister-in-law Yajaira C. Rodriguez, but in fact controlled by Hector Senior and Hector Junior.

33.     Proyecto Gold 901 BV ("Proyecto") is a Curaçao company, upon information and belief, controlled by Javier Otero.

34.     Ralex Investment Corporation ("Ralex") was a Florida corporation first ostensibly owned by Hector Senior's sister-in-law Yajaira C. Rodriguez, and then ostensibly owned by Anibal Alberto Monteiro Ramos, but in fact controlled by Hector Senior and Hector Junior.

35.     Ramcar Corp. ("Ramcar") is an Anguilla company controlled by Javier Otero.

36.     Resolve Inc. ("Resolve") is a company registered in Belize ostensibly owned by Edicson Urdeneta Sequera, but, upon information and belief, is in fact controlled by Jacqueline Castellon, Hector Senior and Hector Junior.

37.     Rodriguez Investment Corp. ("Rodriguez") was a Florida corporation ostensibly owned by Hector Senior's sister-in-law Yajaira C. Rodriguez, but in fact controlled by Hector Senior and Hector Junior.

38.     Town & Country Gold Ltd. ("Town & Country") is a company registered in Belize, upon information and belief, controlled by Jacqueline Castellon, Hector Senior and Hector Junior.

39.     Tramarfin Corp. ("Tramarfin") is a Florida corporation ostensibly owned by Hector Junior's cousin, Leonardo A. Anez Gonzalez, but in fact controlled by Hector Senior and Hector Junior.

40.     Yagon Corp. ("Yagon") is a Florida corporation ostensibly owned by Hector Senior's sister-in-law Yajaira C. Rodriguez, but in fact controlled by Hector Senior and Hector Junior.

41.     Yarodfin Corp. ("Yarodfin") is a Florida corporation ostensibly owned by Hector Senior's sister-in-law Yajaira C. Rodriguez, but in fact controlled by Hector Senior and Hector Junior.

***Select Non-Party Gold Trading Participants***

42.     Argor-Heraeus, SA ("Argor") is the Swiss gold refining company.

43.     Banca Arner SA, Aarner Bank, now One swiss bank SA ("Aarner Bank"), is a Switzerland-based private bank used to pay proceeds of gold sales.

44.     Brinks Global Services (with affiliates, "Brinks") is the provider of precious metals logistics, inventory management and transportation services.

45.     Commerzbank is a Germany-based bank used to pay proceeds of gold sales.

46.     Cupremeco USA, LLC ("Cupremeco USA") was the Florida limited liability company owned by Mario Pataro.

47.     Curaçao Precious Metals & Co Free Zone N.V. ("Cupremeco") was the Curaçao logistics company owned by Mario Pataro.

48.     Gold America S.A. (with affiliates and successors, "Gold America") is the Panama company founded in 1952 by Mario Pataro's father and uncle, and, upon information and belief, beneficially owned by Mario Pataro and his family (and renamed Atlantic Wholesaler Inc SA).

49.     İar Doviz Kiymetli Madenler Yetkili A.S. ("IAR Doviz Istanbul") is, upon information and belief, a Turkish currency exchange company used by the defendants to transmit currencies and exchange between Venezuelan *bolivares*, U.S. dollars and/or Euros.

50.     IGR Precious Metals DMCC ("IGR") is a Dubai-based gold broker.

51.     Istanbul Altin Refinerisi ("Altin") is the Turkish gold refining company.

52.     Italpreziosi S.p.A. (with affiliates, "Italpreziosi") is the Italian gold refining company.

53.     Kaloti Jewelry International DMCC (with affiliates, "Kaloti") is the Dubai gold refining company.

54.     MKS Finance SA (together with MKS Pamp Group, "MKS") is a precious metals trader and refiner based in Switzerland.

55.     Newmont Corporation (together with Newmont Mining Corporation, "Newmont") is a multi-national mining company incorporated in Delaware and headquartered in Colorado, with operations among other places in Paramaribo, Suriname.

56.     N.F. Curaçao Trading N.V. ("NFC Trading") was the Curaçao logistics company, predecessor to Cupremeco, owned by Mario Pataro.

57.     N.F. Import / Export ("NF Panama") was the Panama company owned by Mario Pataro.

58.     N.F. Import / Export Paraguay ("NF Paraguay") was the Paraguay company operated by Mario Pataro.

59.     Precious Metals Service SA ("PMS"), operated by Marco Briccola, is the Swiss-based broker of gold sales by the defendants to Argor.

60.     Swissport Cargo Services – Aerocargo BV ("Swissport") is the Curaçao shipping and logistics company.

61.     Transvalue, Inc. ("Transvalue") is the South Florida-based company used by the defendants for transport, customs clearing and brokerage services for gold (since renamed IBI International Logistics).  In 2021, federal prosecutors charged Transvalue's CEO Jesus Gabriel Rodriguez, Jr. with facilitating a $140 million transnational illicit gold smuggling operation aimed at laundering cash with alleged ties to criminal activity.  Prosecutors alleged that he used Transvalue to facilitate the importation of thousands of kilograms of illicitly sourced gold being flown into the United States from Curaçao.

62.     Value Logistics Corp. ("Value Logistics") is the South Florida-based provider of logistics and customs clearing services for gold.

***Mario Pataro and Certain Related Non-Parties***

63.     Rachele Angiolini is Mario Pataro's adult stepdaughter, the daughter of his current wife, Chiara Bacconi.  Rachele Angiolini resides at a condominium in the "SLS Building" located in Miami (the "SLS Property").  The SLS Property is titled in the name of Fernandez & Associates.

64.     Chiara Bacconi is Mario Pataro's current wife who, upon information and belief, resides with Mario variously in Panama and Italy and possibly other unknown locations, and from time to time at the SLS Property.

65.     Mario Pataro is a natural person residing, upon information and belief, in Panama and Italy, a judgment debtor and ex-husband of Plaintiff.

66.     Marina Pataro is the adult daughter of Mario Pataro and Plaintiff, who resides at a condominium in the "RISE Building" in Miami (the "RISE Property").  The RISE Property is titled in the name of Fernandez & Associates.

## Factual Allegations

### *Gold Smuggling*

67.     The defendants have for many years been engaged in buying and selling billions of dollars in Venezuelan gold.

68.     Records of Brinks, Cupremeco, Cupremeco USA, NFC Trading, NF Panama, NF Paraguay, Transvalue and Value Logistics show that in the last decade or so, the defendants have exported and sold billions of dollars worth of Venezuelan gold.  The defendants sold gold to Argor in Switzerland, to Altin in Turkey, to Kaloti in Dubai and to Italpreziosi in Italy, and through the brokers IGR and PMS.  Brinks records also suggest the defendants may have shipped gold to Paramaribo, Suriname, consigned to MKS and Newmont.

69.     For example, according to those records, in 2011, the defendants made well over 100 shipments of gold worth more than $300 million, to Kaloti and to Argor, through Miami using Transvalue.

70.     From February 2012 through October 2014, in the name of Caran Precious Metals, the defendants made at least 376 shipments of gold worth approximately $1,087,989,646, to Kaloti and to Argor.  During the first half of 2012, approximately 70 of those shipments were made through Miami using Transvalue.

71.     From October 2014 through December 2015, in the name of Jasel, the defendants made at least 67 shipments of gold worth approximately $232,973,435, to Kaloti and to Argor.  In March and April 2015, at least 13 of those shipments were made through Miami using Transvalue.

72.     From January through April 2015, in the name of A&C Trading, the defendants made at least 16 shipments of gold worth approximately $35,355,824, to Argor.  At least six of those were made through Miami using Transvalue.

73.     Records further show that the defendants made additional shipments of gold to Argor from late 2015 through 2016, using Ramcar and JJ Brothers as shipper.

74.     From January 2016 through October 2017, in the name of Oneida, the defendants made at least 99 shipments of gold worth approximately $230 million, to Argor and to Altin.

75.     Records further show that the defendants made at least 150 additional gold shipments in 2017, worth more than $400 million, to Argor and to Altin.

76.     In 2018, the defendants made more than 50 shipments of gold worth over $200 million, to Italpreziosi and to Argor.

77.     Brinks records further show that, between January 2013 and December 2016, Cupremeco USA and Cupremeco provided logistics on hundreds of shipments of gold to Paramaribo, Suriname, consigned to either MKS or Newmont.  Upon information and belief, some or all those shipments were made on behalf of the defendants.

78.     Upon information and belief, for most of the defendants' shipments of Venezuelan gold evidenced by the shipping records, including most of the nearly 200 made through Miami, the defendants knowingly and falsely declared the origin of the gold as Curaçao, when in fact the origin of the gold was Venezuela.

79.     Additionally, records of payments of proceeds from gold sales from PMS and others show that the defendants made substantially more shipments—over and above the shipments shown by the shipping records detailed above—and continued those activities through at least 2019.

80.     For each of the gold shipments exported from Venezuela through the United States, where the defendants falsely declared the origin of the gold as Curaçao, they violated Title 18, United States Code, Section 542 (entry of goods by means of false statements).

81.     For each of the gold shipments exported from Venezuela, where the defendants falsely declared the origin of the gold as Curaçao, it was an offense against a foreign nation (violations of the laws of Curaçao against illegal mining, false statements in customs declarations, and gold smuggling).

***Money Laundering***

82.     As described above, the defendants used their offshore companies, including Caran Precious Metals, Jasel, A&C Trading, JJ Brothers, Panaton, Proyecto, Interactive Ameritrade, Resolve, Town & Country, CP Golden Bridge, Ingeser, Ramcar, Acroyali, Oneida, and others, to sell Venezuelan gold to refineries and brokers in Europe and the Middle East, including Argor, Altin, Kaloti, Italpreziosi, IGR and PMS.

83.     Further, the defendants used their United States companies, including Auryquim, Caran Consultant, Corofin, Globalfin, Gold Trading Center, Precofin Florida, Ralex, Rodriguez, Tramarfin, Yagon, Yarodfin, and others, to receive wire payments in the United States and to distribute the proceeds from the gold sales.

84.     A natural inference from the defendants' use of these numerous companies and numerous bank accounts is that the defendants sought to avoid scrutiny from the banks' anti-money laundering efforts, and, upon information and belief, to hedge against the risk of suspicious activity reporting by the banks and the risk of seizures in connection with investigations by law enforcement.

85.     According to records of wire transfers from PMS and according to information contained in invoices identifying onshore sub-accounts, from 2016 through at least 2019, PMS made hundreds of payments totaling hundreds of millions of dollars to the defendants' companies' accounts with numerous banks in the United States.

86.     In addition to those transfers, upon information and belief, and in connection with the gold sales evidenced by shipping records, the defendants transferred substantial amounts of proceeds into the United States from Ramcar in Anguilla, Panaton in Dubai and Oneida in Dubai.

87.     For each of the transfers from a place outside of the United States to a place in the United States, of the proceeds from gold shipments where the defendants falsely declared the origin of the gold as Curaçao and/or where the transfers were made knowing the proceeds were from unlawful activity, or made with the intent to promote the same, or to conceal the nature, location, source, ownership or control of the proceeds, or to avoid transaction reporting requirements, the defendants violated Title 18, United States Code, Section 1956 (money laundering).

***Real Estate Investment Companies***

88.     The defendants, or some of them, used the proceeds from their enterprises to acquire or maintain, directly or indirectly, interests in or control of real estate investment companies and to invest in real estate projects in the United States, including in Miami, and overseas.

89.     For example, in 2021, the city of Miami's Urban Development Review Board recommended approval of plans by owner-developer Merrick Towers to construct two 20-story buildings and a parking garage with nearly 390 thousand square feet of residential, office and commercial-retail space in Miami nearby the Douglas Road Metrorail Station. Upon information and belief, Merrick Towers is controlled by Hector Senior and has been funded by the proceeds of gold trading, some of which is detailed above.

90.     In 2021, developer Flagami Storage applied for approval to build a 7-story, nearly 180 thousand square foot self-storage facility at 5402 West Flagler Street in Miami.  Upon

information and belief, Flagami Storage is controlled by Hector Senior and has been funded by the proceeds of gold trading, some of which is detailed above.

91.     Upon information and belief, the defendants, or some of them, are associated with numerous other real estate investment companies and many millions of dollars invested in projects in Florida, Georgia and elsewhere.  These include investments with the Desarrollos Hotelco Group (Turks & Caicos hotel project associated with Francisco Illarramendi), properties in Georgia, and a number of Florida projects, including Killian Greens LLC (associated with Killian Greens golf course), The Townhouses at Killian LLC, Indigo at Palmetto Bay LLC (associated with a 21-unit residential project), Killian Commons LLC (associated with 27 townhouses sold to other single-purpose LLCs), Killian Oaks, LLC, Sunset Oaks LLC and others.

92.     Further, the defendants, or some of them, upon information and belief, also acquired or maintained, directly or indirectly, interests in or control of the real estate management and development company Fernandez & Associates, upon information and belief, to defraud Plaintiff by misrepresenting and concealing Mario Pataro's ownership of the RISE property and the SLS Property.

*Wire Fraud*

93.     For each of the shipments and transfers of sale proceeds by means of false representations of the origin of the gold, and for all these transmissions made to execute the defendants' schemes, the defendants violated Title 18, United States Code, Section 1343 (wire fraud).

*Unlicensed Money Transmitting Businesses*

94.     In 2011, executing a warrant out of the United States District Court for the Eastern District of New York, agents of the United States Internal Revenue Service seized $3,462,768.14

in cash from accounts in the names of Auryquim and Caran Consultant, charging that the funds were involved in unlicensed money transmitting businesses.  In 2013, Auryquim and Caran Consultant entered into a settlement whereby $2,977,040.04 of that amount, plus interest, was forfeited to the U.S. government.

95.     In 2014, the Trustee in defendant Hector Senior's personal bankruptcy case accused him of running an illegal currency exchange business through gold trading.  The Trustee alleged that the business:

> "provided prospective investors with a vehicle to exchange local currency in Venezuela for U.S. dollars by utilizing the precious metals market. This mechanism, contrived by [Hector Senior] and others, provided an illegal currency exchange while avoiding certain expenses associated with the legal market for such currency exchanges, utilizing the unauthorized exportation of precious metals out of Venezuela. Many or most of the transactions conducted through the Import/Export Business during the four-year period prior to the Petition Date were, in truth, such currency exchanges. [Hector Senior] knew or should have known at the time he engaged in such currency exchanges that the currency exchange transactions were in fact illegal."

96.     According to certain invoices and shipping records, the defendants appear to have continued to run money transmitting businesses through their gold trading operations.

97.     For example, records indicate deliveries of gold by the defendants to IAR Doviz Istanbul, and certain invoicing in U.S. dollars to be paid in Euros, and vice versa.

98.     Upon information and belief, the gold exported by the defendants from Venezuela was purchased in Venezuelan *bolivares* and the proceeds paid in U.S. dollars or Euros.

99.     Upon information and belief, the defendants used the gold trade to run currency exchange businesses between Venezuelan *bolivares*, U.S. Dollars and Euros, on gold sold to the gold refiners or to brokers or other parties.

100.    Upon information and belief, the defendants have knowingly conducted, controlled, managed, supervised, directed and/or owned all or part of this money transmitting business, and, upon information and belief, do not have an appropriate money transmitting license in any U.S. State, have not complied with the registration requirements under Section 5330 of Title 31, United States Code, or the regulations prescribed under that section, and/or are in any event otherwise involved in the transmission of funds known by the defendants to have been derived from criminal offenses and/or intended to be used to promote or support unlawful activity (namely, gold smuggling, money laundering and wire fraud described above), in violation of Title 18, United States Code, Section 1960 (unlicensed money transmitting businesses).

***Florida Family Court Litigation Between Plaintiff and Mario Pataro***

101.    Plaintiff and Mario Pataro married in 1989.  In 2008, Mario Pataro sued for divorce in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade, Family Division (the "Florida Court") and, in 2009, the couple entered into a settlement agreement by which they were to distribute marital assets.

102.    Plaintiff thereafter learned from an affidavit submitted by Mario Pataro in a separate civil case, that Mario Pataro owned a valuable business that he had not disclosed to Plaintiff.

103.    As a result, Plaintiff moved the Florida Court to set aside the settlement between Plaintiff and Mario Pataro on the ground it was fraudulently induced.

104.    During the ensuing litigation, the Florida Court found that Mario Pataro had lied under oath, submitted false evidence and enlisted the help and support of third parties to commit widespread perjury designed to conceal his assets.  The Florida Court further held Mario Pataro in

16

contempt for violating court orders, and, in September and October 2017, issued writs of bodily attachment for Mario Pataro's arrest.

105.    In September 2017, to evade arrest and the reach of the Florida Court, Mario Pataro fled the jurisdiction.

106.    Ultimately, after hearing evidence of Mario Pataro's actual assets, on June 29, 2018, the Florida Court set aside the fraudulently induced 2009 settlement between Plaintiff and Mario Pataro and entered a money judgment in favor of Plaintiff and against Mario Pataro in the amount of $49,524,834 plus post-judgment interest.

107.    Mario Pataro has not made any payment toward satisfaction of the judgment. Instead, he remains a fugitive and has further structured and secreted his assets to make himself judgment proof.

***Defendants Conspired and Used the Enterprise(s) to Injure Plaintiff***

108.    Beginning in 2017, upon information and belief, the defendants agreed among themselves to use, and began using their money laundering, money transmitting and wire fraud operations to fraudulently misrepresent and conceal Mario Pataro's assets from Plaintiff.

109.    The defendants used their enterprises, the proceeds from them, and their control of Fernandez & Associates, to defraud Plaintiff by misrepresenting the origins of payments and the ownership of certain assets, where instead, upon information and belief, Mario Pataro made the payments and/or actually owns the assets.

110.    From 2017 through at least 2019, upon information and belief, the defendants used their onshore companies to make numerous misrepresented payments worth hundreds of thousands of dollars, to Mario Pataro's wife, Chiara Bacconi, and to and on behalf of Mario Pataro's daughter

and stepdaughter, for the purpose of concealing the actual origin of the payments, Mario Pataro, and the attendant assets and accounts from which they were funded.

111.   For example, in December 2019, Ralex sent $26,005 to the University of Miami to pay tuition for Marina Pataro, on behalf of Mario Pataro, for that same purpose.

112.   For another example, upon information and belief, in July 2018, the defendants used Yarodfin to transfer $55,000 from Mario Pataro to his daughter, Marina Pataro, by which Mario Pataro bought Marina a new BMW convertible, on July 31, 2018, for $52,967.22.

113.   Upon information and belief, the defendants have used their operations further, since 2017 to the present, to misrepresent, conceal and disguise the assets of Mario Pataro, including distributions and/or dividends from companies in which Mario Pataro holds beneficial interests, along with cash, income and other property interests of Mario Pataro.

115.   In or before January 2019, upon information and belief as detailed below, the defendants acquired or maintained and used their interests in or control of Fernandez & Associates, and the proceeds from gold (sold to Argor through PMS, or otherwise) to acquire and hold legal title to two luxury condominiums in Miami on Brickell Avenue, the RISE Property and the SLS Property, on behalf of Mario Pataro, that, upon information and belief, he bought for his adult daughter and his adult stepdaughter to live in.

116.   In mid-January 2019, Mario Pataro and his daughter Marina Pataro discussed Marina's then-current living situation in Miami, and on January 13, 2019, Mario Pataro texted his daughter: "I will try to get you out of there ASAP."

117.   Two days later, on January 18, 2019, according to records produced by Brinks, Gold America tendered 49.1 kilograms of gold for export from Panama, with a declared value of

$1,487,961.84.  Upon information and belief, Gold America tendered that gold on behalf of Mario Pataro.

118.    By January 25, 2019, Marina Pataro texted her father:  "I can't wait to move."  He responded that same day: "Very soon.  May be 8-10 days . . . I am doing my best."

119.    On January 29 and January 30, 2019, the defendants made two transfers from an account in the name of Corofin to First American Trust, in the combined amount of $646,557.  Upon information and belief, that money was used to close on the RISE Property, purchased notionally in the name of Fernandez & Associates.

120.    Upon information and belief, the RISE Property was purchased on behalf of Mario Pataro (with the proceeds from the gold tendered by Gold America on his behalf in Panama, or with other funds).  By the first week of February 2019, Marina Pataro moved into the RISE Property, where she continues to reside today.

121.    Separately, on February 5 and February 6, 2019, the defendants made two transfers from an account in the name of Rodriguez to real estate lawyers in Miami in the combined amount of $654,814.  Upon information and belief, that money was used to close on the SLS Property, purchased notionally in the name of Fernandez & Associates.

122.    Upon information and belief, the SLS Property was purchased on behalf of Mario Pataro (with the proceeds from the gold tendered by Gold America on his behalf in Panama, or with other funds).  Rachele Angiolini, Mario Pataro's stepdaughter and the adult daughter of Mario Pataro's current wife, Chiara Bacconi, moved into and currently resides at the SLS Property.

### First Claim
### Civil RICO, 18 U.S.C. § 1962(c)

123.    Plaintiff re-alleges and incorporates the allegations contained in all the foregoing paragraphs as if fully set forth herein.

124.     The defendants violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below, causing injury to Plaintiff.

**The Enterprise(s)**

125.     The defendants, together with the defendant-controlled companies, form an association-in-fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity.  The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.  There may also be other members of the enterprise who are unknown at this time.

126.     Alternatively, the defendant-controlled companies each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

127.     Alternatively, the defendant-controlled companies together constitute an enterprise within the meaning of 18 U.S.C. § 1961(4).

128.     Each enterprise has engaged in, and their activities have affected, foreign commerce.

**Pattern of Racketeering Activity**

129.     The defendants, each of whom are associated with, or employed by, the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5) and 1962(c).  The racketeering activity was made possible by the defendants' regular and repeated use of the facilities of the enterprise.  The defendants had the specific intent to engage in the substantive RICO violations alleged herein.

130.    Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below.  The defendants each committed at least two such acts or else aided and abetted such acts.

131.    The acts of racketeering were not isolated, but rather the acts of the defendants were related in that they had the same or similar purpose and result, participants, victim and method of commission.  Further, the acts of racketeering by the defendants have been continuous.  There was repeated conduct during a period of years and continuing to the present, and there is a continued threat of repetition of such conduct.

132.    The defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described herein.

***Predicate Acts***

133.    The defendants committed acts constituting indictable offenses under 18 U.S.C § 1343 in that they devised or intended to devise a scheme or artifice to defraud Plaintiff by means of false or fraudulent pretenses or representations.  To execute their scheme or artifice, the defendants transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce various, writings, signs and signals.

134.    The acts of the defendants set forth above were done with knowledge that the use of the wires would follow in the ordinary course of business, or that such use could have been foreseen.  These acts were done intentionally and knowingly with the specific intent to advance the defendants' scheme or artifice.

135.    The defendants carried out their scheme in different countries and could not have done so unless they used interstate wires.  In furtherance of their scheme alleged herein, the

defendants communicated among themselves and others.  The communications were transmitted by wire (*i.e.*, electronically).

136.    The defendants used wires to make and to misrepresent the origin of the payments detailed above, upon information and belief, made on behalf of Mario Pataro.  The defendants used wires to transmit those funds to the United States.  Plaintiff has been damaged as a direct and proximate result of the defendants' use of wires as alleged herein.

137.    The defendants committed acts constituting indictable offenses under 18 U.S.C. § 1956 in that, having devised or intended to devise a scheme or artifice to defraud Plaintiff by means of false or fraudulent pretenses or representations, they transferred or caused to be transferred from a place outside of the United States to a place in the United States, the proceeds from gold shipments where the defendants falsely declared the origin of the gold as Curaçao and/or where the transfers were made knowing the proceeds were from unlawful activity, or made with the intent to promote the same, or to conceal the nature, location, source, ownership or control of the proceeds, or to avoid transaction reporting requirements.

138.    These acts were done intentionally and knowingly with the specific intent to advance the defendants' scheme or artifice.  Plaintiff has been damaged as a direct and proximate result of the defendants' money laundering transactions as alleged herein.

139.    The defendants, or some of them, committed acts constituting indictable offenses under 18 U.S.C. § 1952 in that, having devised or intended to devise a scheme or artifice to defraud Plaintiff by means of false or fraudulent pretenses or representations, they traveled in foreign commerce and used facilities of foreign commerce to promote, manage and facilitate the continuation of their scheme.

140.    These acts were done intentionally and knowingly with the specific intent to advance the defendants' scheme or artifice.  Plaintiff has been damaged as a direct and proximate result of the defendants' travel in furtherance of the scheme to defraud Plaintiff.

141.    The defendants committed acts constituting indictable offenses under 18 U.S.C. § 1960 in that, having devised or intended to devise a scheme or artifice to defraud Plaintiff by means of false or fraudulent pretenses or representations, they controlled, managed, supervised, directed and/or owned all or part of money transmitting businesses, and, upon information and belief, did not have an appropriate money transmitting license in any U.S. State, have not complied with the registration requirements under Section 5330 of Title 31, United States Code, or the regulations prescribed under that section, and/or are in any event otherwise involved in the transmission of funds known by the defendants to have been derived from criminal offenses and/or intended to be used to promote or support unlawful activity.

142.    These acts were done intentionally and knowingly with the specific intent to advance the defendants' scheme or artifice.  Plaintiff has been damaged as a direct and proximate result of the defendants' unlicensed money transmitting business.

143.    The defendants' violations of law as set forth herein, each of which directly and proximately injured Plaintiff, constituted a continuous course of conduct spanning a period of years, which was intended to defraud Plaintiff by misrepresenting and concealing Mario Pataro's assets.  The violations were a part of a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

144.    The unlawful actions of the defendants directly and proximately caused and continue to cause injury to Plaintiff.  Plaintiff seeks an award of damages in compensation for having been deprived of millions of dollars in recovery on Plaintiff's judgment.  Plaintiff

accordingly seeks an award of three times the damages Plaintiff sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief authorized by law.

## Second Claim
### Civil RICO, 18 U.S.C. § 1962(b)

145.    Plaintiff re-alleges and incorporates the allegations contained in all the foregoing paragraphs as if fully set forth herein.

146.    The defendants violated 18 U.S.C. § 1962(b) by the acts described in the prior paragraphs, and as further described below, causing injury to Plaintiff.

147.    The defendants, through a pattern of racketeering activity and with the proceeds derived from a pattern of racketeering activity (as detailed above), acquired or maintain, directly or indirectly, interests in or control of Fernandez & Associates, which notionally holds title to the SLS Property and the RISE Property.

148.    The defendants acquired or maintain interests in or control of Fernandez & Associates intentionally and knowingly with the specific intent to advance the defendants' scheme or artifice.  Plaintiff has been damaged as a direct and proximate result of the defendants' control of or interests in Fernandez & Associates.

149.    The unlawful actions of the defendants directly and proximately caused and continue to cause injury to Plaintiff.  Plaintiff seeks an award of damages in compensation for having been deprived of millions of dollars in recovery on Plaintiff's judgment.  Plaintiff accordingly seeks an award of three times the damages Plaintiff sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief authorized by law.

## Third Claim
## Civil RICO Conspiracy, 18 U.S.C. § 1962(d)

150.     Plaintiff re-alleges and incorporates the allegations contained in all the foregoing paragraphs as if fully set forth herein.

151.     In violation of 18 U.S.C. § 1962(d), the defendants knowingly, willfully and unlawfully conspired to facilitate a scheme which included the operation or management of one or more RICO enterprises through a pattern of racketeering activity as alleged above.

152.     The conspiracy commenced not later than 2017 and is ongoing.

153.     The conspiracy's purpose is to fraudulently prevent Plaintiff from recovering on Plaintiff's judgment against Mario Pataro through illegal means as detailed herein.

154.     The defendants committed at least one overt act in furtherance of the conspiracy. The acts in furtherance of the conspiracy included misleading Plaintiff as to the true origin of payments made by or on behalf of Mario Pataro, misleading Plaintiff as to the true ownership of valuable assets of Mario Pataro and using their control of or interests in Fernandez & Associates to mislead Plaintiff as to the true ownership of the SLS Property and the RISE Property.

155.     Even if some of the defendants did not agree to harm Plaintiff specifically, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiff was a reasonably foreseeable consequence of the defendants' actions.

156.     Plaintiff has been injured and continues to be injured by the defendants' conspiracy. The unlawful actions of the defendants proximately caused and continue to cause injuries to Plaintiff.  Plaintiff seeks an award of damages in compensation for having been deprived of millions of dollars in recovery on Plaintiff's judgment. Plaintiff accordingly seeks an award of three times the damages Plaintiff sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief authorized by law.

**Fourth Claim**
**Fraud**

157.    Plaintiff re-alleges and incorporates the allegations contained in all the foregoing paragraphs as if fully set forth herein.

158.    The defendants, upon information and belief, knowingly and intentionally misled Plaintiff by disguising the source of payments and beneficial ownership of property.

159.    The defendants' false representations and concealment was material in that it deprived Plaintiff of recovery on Plaintiff's judgment.

160.    Plaintiff justifiably relied on the defendants' misrepresentations contained in numerous third-party records of banks, shipping companies, gold brokers, real estate transactions, the University of Miami, and others detailed herein, and justifiably relied on the defendants' intentional concealment of Mario Pataro's valuable assets.

161.    The defendants' conduct was willful and malicious.

162.    The defendants' unlawful conduct has directly and proximately caused and continues to cause injuries to Plaintiff.  This injury includes Plaintiff being denied lawful recovery on Plaintiff's judgment and in paying for investigations and litigation.  Plaintiff seeks compensation for Plaintiff's injuries and seeks the imposition of punitive damages as may be available and in amount sufficient to deter the defendants from committing the unlawful conduct in the future.

**Fifth Claim**
**Conspiracy to Defraud**

163.    Plaintiff re-alleges and incorporates the allegations contained in all the foregoing paragraphs as if fully set forth herein.

164.    The defendants combined and agreed with each other and/or others to defraud Plaintiff by misrepresenting and concealing the source of payments and Mario Pataro's valuable assets.

165.    The conspiracy commenced not later than 2017.

166.    Pursuant to their agreement(s), the defendants acted in concert to support their common purpose of defrauding Plaintiff in order to deprive Plaintiff from lawfully recovering on Plaintiff's judgment.

167.    The defendants committed at least one overt act in furtherance of the conspiracy, including by misreporting the origin of payments and the ownership of valuable assets.

168.    Upon information and belief, the defendants acted with the common purpose and intent to defraud Plaintiff and understood the other defendants shared that common purpose.

169.    The defendants' conduct was willful and malicious.

170.    The defendants' unlawful conspiracy has directly and proximately caused and continues to cause injuries to Plaintiff.  This injury includes Plaintiff being denied lawful recovery on Plaintiff's judgment and in paying for investigations and litigation.   Plaintiff seeks compensation for Plaintiff's injuries and seeks the imposition of punitive damages as may be available and in amount sufficient to deter the defendants from committing the unlawful conduct in the future.

## Prayer

WHEREFORE, Plaintiff respectfully requests the Court to enter an order and judgment:

a.    Awarding compensatory damages in an amount to be determined at trial;

b.    Awarding threefold damages on Plaintiff's RICO claims;

c.      Awarding other and further punitive damages as may be available;

d.      Awarding the costs and expenses of this action, including attorneys' fees; and/or

e.      Such other and further relief as the Court may deem just and proper as the circumstances may require.

Dated: Miami, Florida
      March 22, 2022

Respectfully submitted,

**KOBRE & KIM LLP**

By: /s/ Marcus J. Green
Marcus J. Green, Esq.
Fla. Bar No. 64293
Marcus.Green@kobrekim.com

Gabriela M. Ruiz, Esq.
Fla. Bar No. 46844
Gabriela.Ruiz@kobrekim.com

Andrew C. Lourie, Esq.
Fla. Bar No. 87772
Andrew.Lourie@kobrekim.com

KOBRE & KIM LLP
201 South Biscayne Blvd, Suite 1900
Miami, Florida 33131
Telephone: 305.967.6100
Facsimile: 305.373.9443

*Attorneys for Plaintiff Ellen Pataro*